U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

Signed June 8, 2006                                                                 **United States Bankruptcy Judge**

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| LLM RESTAURANT SERVICES, INC. | § | CASE NO. 05-39195-BJH-11 |
| | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |
| | § | |
| SHAWN K. BROWN, CHAPTER 11 | § | |
| TRUSTEE OF LLM RESTAURANT | § | |
| SERVICES, LLC | § | |
| | § | |
| Plaintiff | § | |
| v. | § | ADV. PROC. NO. 05-03714 |
| | § | |
| DFW POP RESTAURANTS, LLC | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

On May 11, 2006, the Court tried the issues raised by the removed state court petition and

amended petition (the "Amended Petition") filed by DFW Pop Restaurants, LLC ("DFW Pop") and the issues raised by the amended answer and original counterclaim (the "Counterclaim") filed by LLM Restaurant Services, Inc. ("LLM"), but now brought by Shawn K. Brown, Chapter 11 Trustee of LLM (the "Trustee"). The Court has core jurisdiction over the parties and the issues raised in this adversary proceeding in accordance with 28 U.S.C. §§ 1334 and 157(b). The Court adopts the statement of stipulated facts set forth in the parties' Pretrial Order, which the Court entered on April 26, 2006. In addition, the Court makes the following additional findings of fact and conclusions of law.

**I.     Background Facts and Parties' Contentions**

At issue here is a sublease between DFW Pop and LLM with respect to a portion of the premises leased by LLM at DFW Airport. By way of brief background, on September 4, 2002, LLM entered into a lease agreement (the "Main Lease") with the DFW International Airport Board (the "Airport Board"). Pursuant to the Main Lease, LLM leased three (3) premises at DFW Airport at which LLM would operate concessions – specifically, either Mr. Gatti's Pizza or Popeye's Chicken concessions. According to the Main Lease, the leased premises were located at gates A-7, E-27, and E-56.[1]

Thereafter, LLM subleased the premises at gate A-7 (the "Sub-Premises") to DFW Pop pursuant to a written sublease agreement dated February 7, 2003 (the "Sublease"). Beginning on August 22, 2003, and after building out the Sub-Premises, DFW Pop operated a Popeye's Famous Chicken restaurant at the Sub-Premises, and LLM operated Mr. Gatti's Pizza restaurants at the other

---

[1] At trial, the parties stated that the leased premises were located at gates A-14, E-15, and E-36. Whether the Sub-Premises is at gate A-7 or gate A-14 is not material to the outcome here.

**Memorandum Opinion and Order**                                                                                                         Page 2

two locations.

Two causes of action are asserted by DFW Pop in the Amended Petition filed on December 19, 2005: (1) breach of contract, and (2) declaratory relief. In summary, DFW Pop contends that LLM breached the Main Lease by failing to pay rent to the Airport Board as required by the Main Lease.[2] In addition, DFW Pop contends that LLM breached the Sublease by failing to provide it with the gross sales information for LLM's two restaurants so that DFW Pop could calculate the percentage rent it owed to LLM under the Sublease with respect to the Sub-Premises.[3] In its declaratory relief claim, DFW Pop seeks this Court's determination that it is correctly interpreting its percentage rent obligation to LLM under the Sublease.

Two causes of action are asserted by LLM in the Counterclaim filed on April 19, 2005: (1) breach of contract, and (2) tortious interference. In summary, the Trustee contends that DFW Pop underpaid rent due under the Sublease by incorrectly calculating its percentage rent obligation to LLM. According to the Trustee, because DFW Pop substantially underpaid its rent to LLM, LLM

---

[2]The Sublease is quite one-sided. While the Sublease imposes numerous obligations on DFW Pop, as the subtenant, there are few, if any, reciprocal provisions imposing express obligations on LLM, as sublandlord. And, while the terms of the Main Lease are "made a part [of the Sublease] for all purposes," Sublease at ¶ 2, there is no provision in the Sublease which makes a breach of the Main Lease a breach of the Sublease. So, while DFW Pop complains of LLM's breach of the Main Lease, it is not clear what standing DFW Pop has to assert such a breach, given the absence of a provision in the Sublease making a breach of the Main Lease by LLM a breach of the Sublease.

[3]While DFW Pop's argument flows logically, because DFW Pop had to calculate its rent obligations under the Sublease based, in part, on the relative sales from each of the three locations leased to LLM under the Main Lease, there is no express provision in the Sublease which obligates LLM to provide that information to DFW Pop. And, as the evidence at trial established, the sales information on each concession at DFW airport is available to all other concessionaires from the Airport Board. Accordingly, because the information was otherwise available to DFW Pop, and Texas law (the governing law under the Sublease) disfavors implied covenants, the Court is not convinced that LLM breached the Sublease. *See Universal Health Services, Inc., et al. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 747 (Tex. 2003) (stating that, in rare circumstances, a court may imply a covenant in order to reflect the parties' real intentions); *City of Midland v. O'Bryant*, 18 S.W.3d 209, 215 (Tex. 2000) (noting that the Texas Supreme Court has specifically rejected the implication of a general duty of good faith and fair dealing in all contracts); *TFW Mgmt., Inc. v. Westwood Shores Prop. Owners Assoc.*, 79 S.W.3d 712, (Ct. App. – Houston 2002) (rejecting the implication of a duty of accounting where the contract is silent on the matter).

was unable to continue to pay its obligations under the Main Lease to the Airport Board, and LLM's admitted failure to pay rent under the Main Lease should be excused. The Trustee further contends that DFW Pop communicated with the Airport Board concerning the terms of the Main Lease and intentionally withheld rent due under the Sublease making it impossible for LLM to perform under the Main Lease. In short, the Trustee contends that by intentionally withholding rent, DFW Pop forced the ultimate breach of the Main Lease by LLM, thereby tortiously interfering with the Main Lease.[4]

## II. Legal Analysis

### A. Rent Obligations

From the Court's perspective, the ultimate issue that controls the outcome here is who is correctly interpreting the percentage rent obligations under the Sublease. Obviously, that is the only issue raised by the declaratory relief claim asserted by DFW Pop. While the Court's statement of the ultimate issue may seem like an oversimplification of the breach of contract issues raised by the parties, a resolution of all of the contract issues is unnecessary for the reasons explained more fully below.

For example, the parties spent much time arguing over who first breached the agreements at issue here. Did LLM breach the Main Lease first by failing to pay rent to the Airport Board (which, according to DFW Pop, would then be a breach of the Sublease as the Main Lease was "made a part [of the Sublease] for all purposes," Sublease at ¶ 2), or did DFW Pop breach the Sublease first by intentionally underpaying percentage rent to LLM? Each party contends the other materially

---

[4]Counsel for the Trustee conceded at trial that the Trustee's tortious interference claim was dependent on his interpretation of the Sublease. In essence, the Trustee conceded that if DFW Pop was correctly interpreting the Sublease's rent obligations, there was no tortious interference claim to be asserted against DFW Pop.

**Memorandum Opinion and Order** **Page 4**

breached first, thereby excusing the other party from further performance.

However, if DFW Pop's interpretation of its percentage rent obligations under the Sublease is correct, then its failure to pay this rent obligation to LLM on a timely basis is not what caused LLM to breach the Main Lease. Stated most simply, LLM's two restaurants were performing so poorly that LLM could not have paid its rent obligations under the Main Lease even if DFW Pop had timely paid the percentage rent due under DFW Pop's interpretation of the Sublease. Accordingly, unless DFW Pop was obligated to pay the percentage rent as calculated by LLM, LLM's breach of the Main Lease was inevitable, given the under-performance of its two restaurants. So, while DFW Pop admittedly breached the Sublease by failing to pay all of the rent due to LLM (even under DFW Pop's interpretation of the percentage rent requirements), LLM's breach of contract claim fails as a matter of law because of a lack of causation – *i.e.*, DFW Pop's breach of the Sublease did not cause LLM to default on its rent obligations to the Airport Board under the Main Lease.

In contrast, DFW Pop contends that LLM breached the Sublease by failing to provide it with the gross sales information for LLM's two restaurants (so that DFW Pop could calculate the percentage rent owing to LLM under the Sublease). However, as noted previously, the Sublease contains no such contractual provision. *See supra* note 3. Moreover, even assuming such a covenant should be implied into the Sublease, LLM's alleged breach of such an implied covenant is irrelevant to the outcome here because DFW Pop failed to put on any evidence of damages it suffered from such a breach by LLM. Accordingly, the Court will turn to the ultimate issue here – *i.e.*, the correct interpretation of the percentage rent provision of the Sublease.

Paragraph 3 of the Sublease states the rent obligations of DFW Pop to LLM, which is comprised of four (4) components. As noted previously, the rent component in dispute here is the

percentage rent. But, to put this dispute in context, additional facts are required. Under the Main Lease, LLM was obligated to pay the Airport Board rent and certain other "scheduled charges." According to section 5.01(A) of the Main Lease, LLM was obligated to pay the Airport Board a minimum annual guarantee rental of $132,000 per year, or $11,000 per month (the "MAG"). In addition to the MAG, LLM was obligated to pay the Airport Board "Percentage Rent," "but only to the extent that said Percentage Rents, calculated on annualized Gross Receipts, exceed the monthly installment of MAG paid in advance for the said month." Main Lease at § 5.01(B). So, under the Main Lease, Percentage Rent was only due if the Percentage Rent for a given month exceeded $11,000.00. Of course, if the Percentage Rent in any month exceeded $11,000.00, only the difference between the Percentage Rent and the MAG was still due. In other words, after calculating the Percentage Rent in any month, credit was given for the MAG already paid, and only the difference, if any, was still due to the Airport Board. Finally, in addition to the MAG and the Percentage Rent, LLM was obligated to pay certain "scheduled charges" – *i.e.*, common area maintenance charges ("CAM Charges"), to the Airport Board on a monthly basis. *Id*. at § 5.02.

With the Main Lease rent obligations firmly in mind, we turn to the Sublease and DFW Pop's rent obligations to LLM under the Sublease. The parties agree that there are four (4) components to DFW Pop's rent obligations under the Sublease: (1) DFW Pop's share of the MAG under the Main Lease, allocable to the Sub-Premises on a per square foot pro rata basis, (2) DFW Pop's share of the CAM Charges under the Main Lease, allocable to the Sub-Premises on a per square foot pro rata basis, (3) "Incentive Rent," which was defined in the Sublease as a flat percentage of the gross receipts from the monthly operation of DFW Pop's restaurant on the Sub-Premises, and (4) the disputed amount of Percentage Rent. The parties' dispute about Percentage Rent is relatively simple.

DFW Pop contends that Percentage Rent was owing under the Sublease only if it would have been owing under the Main Lease. The Trustee disagrees, and contends that Percentage Rent was owing to LLM under the Sublease even if Percentage Rent did not exceed $11,000.00 in a given month, and no Percentage Rent would have been owing under the Main Lease.

While the Sublease is not artfully drafted, after carefully considering the terms of the Sublease as a whole, the Court agrees with DFW Pop's interpretation of the Sublease. The Court concludes that the correct construction of the language used in paragraph 3(a)-(d) of the Sublease obligated DFW Pop to pay LLM the sum of four (4) amounts: (1) DFW Pop's share of the MAG due under the Main Lease, allocable to the Sub-Premises on a per square foot pro rata basis, (2) DFW Pop's share of the Percentage Rent due under the Main Lease, allocable to the Sub-Premises on a sales per square foot basis, (3) DFW Pop's share of the CAM Charges due under the Main Lease, allocable to the Sub-Premises on a per square foot pro rata basis, and (4) the Incentive Rent.

Another provision of the Sublease supports this construction of DFW Pop's rent obligations as well. DFW Pop was entitled to pay the first three items of rent – *i.e.*, its share of the MAG, Percentage Rent, and CAM Charges (collectively defined in the Sublease as "Airport Rent"), directly to the landlord under the Main Lease – *i.e.*, directly to the Airport Board. *See* Sublease at ¶ 3, p. 2. The fact that DFW Pop was entitled to pay the Airport Rent directly to the Airport Board corroborates its contention that these rent components of the Sublease were essentially a pass through of a portion of LLM's rent under the Main Lease to DFW Pop – allocated on either a square foot or a sales per square foot basis. If the Trustee's interpretation of paragraph 3(b) were correct, and DFW Pop exercised its right to pay the Airport Board directly, the Airport Board would find itself in the unusual position of receiving Percentage Rent when none was due under the Main Lease – with no

ability to understand why this additional amount was being paid to it.

While the Trustee contends that paragraph 5(a) of the Sublease supports his construction of the language used in paragraph 3(b) of the Sublease, the Court disagrees. Paragraph 5(a) simply requires DFW Pop to operate its restaurant in accordance with the provisions of the Main Lease (so that LLM would not default under the Main Lease through some act or omission of DFW Pop), while excusing DFW Pop from paying the rent called for under the Main Lease. Obviously, DFW Pop had to be excused from paying rent under the Main Lease because that was LLM's obligation. If DFW Pop was not excused from paying the rent due under the Main Lease, DFW Pop would have been paying for three (3) locations, not just the one (1) location it leased from LLM under the Sublease, and the Airport Board would have been paid rent under the Main Lease twice – once by LLM and once by DFW Pop.

The Trustee next contends that because paragraph 3(b) is capable of two reasonable interpretations, parol evidence should be admitted to explain the parties' intentions at the time the Sublease was entered into. While the Court does not agree that the language of the Sublease is susceptible of two reasonable interpretations, LLM's president, Dwight Luper ("Luper"), testified without objection at trial regarding the circumstances surrounding the negotiation and execution of the Sublease. However, his testimony was unhelpful to resolving this dispute as he provided the Court with no insight regarding the disputed provision. For example, Luper initially testified on cross-examination that his lawyer, Mr. Walker ("Walker"), drafted the Sublease, and that no one else had input into the language chosen. Audiotape: Hearing conducted 5/11/06 at 11:48:30 a.m. - 11:49:12 a.m. (on file with Court). Luper further testified that he did not talk to Walker about getting a national market rate of rent from DFW Pop under the Sublease. Audiotape: Hearing

conducted 5/11/06 at 11:49:50 a.m. - 11:51:01 a.m. (on file with Court). When Luper was asked specifically about the term "allocable" in paragraph 3(b) of the Sublease and his interpretation of that term, Luper replied that he had never interpreted "allocable." Audiotape: Hearing conducted 5/11/06 at 12:01:02 p.m. - 12:02:37 p.m. (on file with Court). And, when asked about the last sentence of paragraph 5(a) of the Sublease, Luper admitted that he had no discussions with Walker about the provision. In fact, Luper admitted that he was not sure what the provision meant at the time the Sublease was entered into or at the time of his trial testimony. Audiotape: Hearing conducted 5/11/06 at 12:04:30 p.m. - 12:05:01 p.m. (on file with Court). For all of these reasons, Luper's testimony was unhelpful in resolving this dispute.

Finally, the Trustee attempts to support his interpretation of the Percentage Rent provision through expert testimony. In essence, the Trustee's expert, Walter Ainesworth, testified that the rent due under the Sublease would be below market if DFW Pop's interpretation of the rent obligation is correct and, while high under LLM's and the Trustee's interpretation, would be more consistent with a market rate for the lease of a single premium space at DFW Airport. Audiotape: Hearing conducted 5/11/06 at 11:01:20 a.m. - 11:03:38 a.m. (on file with Court).

However, the Court does not find this analysis particularly helpful to its interpretation of the Sublease, because it presumes that LLM would not have entered into an arguably below market Sublease. In short, the Trustee asks this Court to interpret the Sublease such that the rent being charged per month is at or above a market rent, instead of interpreting the Sublease such that the monthly rent is at or below market. The problem with this approach is that it there is no evidence in the record to suggest that LLM knew what a national market rent for the Sub-Premises would have been when it entered into the Sublease or, based upon Luper's testimony, that Walker was even trying

to draft a rent provision that approximated a national market rate. Rather, the Incentive Rent component appears to be what LLM thought would compensate it for leasing its most valuable location to DFW Pop, while keeping the two less desirable locations for itself.

For these reasons,[5] when the Sublease is construed as a whole, the Court concludes that DFW Pop was only obligated to pay Percentage Rent to LLM under the Sublease if Percentage Rent was due to the Airport Board under the Main Lease. The parties have stipulated to the calculation of outstanding rent depending on whose interpretation of the rent provisions of the Sublease is correct. Accordingly, the parties agree that DFW Pop owes unpaid rent of $99,787.10 to the Trustee.

### B. Attorney's Fees

Both parties have sought to recover their respective attorney's fees, depending on whose interpretation of the Sublease is upheld. While it is somewhat unusual for a party to be found to be owing substantial sums to the other party and still be the "prevailing party," the Court concludes that DFW Pop is the prevailing party here and is entitled to a recovery of its reasonable attorney's fees. *See Flagship Hotel, Ltd. V. The City of Galveston*, 117 S.W.3d 552, 563-64 (Tex. App.-Texarkana 2003, no pet.) (holding that net recovery in the overall suit is not required to recover attorney's fees under Tex. Civ. Prac. & Rem. Code Ann. § 38.001). In *Flagship Hotel*, the court defined a "prevailing party" as the party in whose favor a judgment is rendered, regardless of the amount of damages awarded. *Id.* at 564.

The starting point of the attorney's fee analysis is the terms of the Sublease itself. Paragraph 18(e) provides that "[i]f any action at law or in equity, including an action for declaratory relief is

---

[5] DFW Pop's expert, Mike Turner, also testified that, in his opinion, DFW Pop's interpretation of its rent obligations under the Sublease was consistent with clear language of the Sublease. Audiotape: Hearing conducted 5/11/06 at 3:05:16 p.m. - 3:05:33 p.m. (on file with Court).

brought to interpret this Sublease, the prevailing party is entitled to recover reasonable attorney's fees from the other. The fees may be set by the court in the trial of the action or may be enforced in a separate action for that purpose, and the fees will be in addition to any other relief that may be awarded." Sublease at ¶ 18(e), p. 8.

Here, DFW Pop brought both a claim for breach of contract and a claim for declaratory relief. DFW Pop is clearly the prevailing party on its declaratory relief claim,[6] as its interpretation of the rent provisions of the Sublease is being upheld. Accordingly, DFW Pop is entitled to recover its reasonable attorney's fees. *See Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex 1999) (prevailing party is entitled to recover attorney's fees from an opposing party if permitted to do so by statute or the parties' contract); *Travelers Indem. Co. of Conn. V. Mayfield*, 923 S.W. 2d 590, 593 (Tex. 1996) (same).

The parties stipulated to the reasonableness of each others attorney's fees. Accordingly, DFW Pop is entitled to a recovery of $250,553.45 as its reasonable attorney's fees in prosecuting its action in state court and this Court, and in seeking a judicial interpretation of the Sublease. Moreover, DFW Pop may setoff its reasonable attorney's fees against its outstanding rent obligation, leaving a net attorney's fee claim of $150,766.35. *See Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 169 n. 15 (Tex. App.-Eastland 2001, pet. denied) (noting that party's recovery of attorney's fees may be offset against recoveries obtained by the opposing party) (citations omitted); *McKinley v. Drozd*, 685 S.W.2d 7, 11 (Tex. 1985) (holding that a party who prevailed in a breach of contract action under

---

[6] While DFW Pop is not prevailing on its breach of contract claim, neither is the Trustee. As noted previously, DFW Pop is unable to identify any express contractual provision of the Sublease that LLM breached. While LLM clearly breached the Main Lease, no provision of the Sublease makes a breach of the Main Lease a breach of the Sublease. Conversely, while DFW Pop clearly breached the Sublease by failing to pay all of the rent due to LLM on a timely basis, the Trustee failed to prove causation. In short, DFW Pop's breach of the Sublease did not cause LLM to breach the Main Lease.

**Memorandum Opinion and Order** **Page 11**

the Deceptive Trade Practices Act should also be awarded attorney's fees, even though the damage award is entirely offset by an opposing claim).

### III. Conclusion

DFW Pop has correctly interpreted its rent obligations under the Sublease. DFW Pop owes unpaid rent to LLM (now the Trustee) of $99,787.10. However, DFW Pop is entitled to recover the reasonable attorney's fees it incurred in this action and in obtaining this judicial interpretation of the Sublease. Because the reasonable attorney's fees incurred by DFW Pop exceed the outstanding rent obligation, the Trustee is not entitled to an affirmative recovery from DFW Pop. And, DFW Pop will have an allowed unsecured claim in LLM's bankruptcy case for its remaining unpaid legal fees in the amount of $150,766.35. A judgment consistent with this Memorandum Opinion and Order will be entered separately.

**SO ORDERED.**

### End of Order ###